**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MONICA GARCIA, as Personal
Representative of the Estate of
Robert Garcia, deceased,

                    Plaintiff,

-vs-                                                        Case No. 3:12-cv-1369-J-34PDB

UNITED STATES OF AMERICA,

                    Defendant.
_____/

## ORDER

**THIS CAUSE** is before the Court on (1) Plaintiff's Motion for Partial Summary

Judgment as to Defendant's Twelfth Affirmative Defense and Incorporated Memorandum

of Law in Support of Same (Doc. 36; Garcia's First Motion), filed on April 2, 2015[1];

(2) Plaintiff's Motion for Partial Summary Judgment as to the Standard of Care Relating

to Delivery of Robert Garcia's Sleep Study Report to His Primary Care Manager and

Incorporated Memorandum of Law in Support of Same (Doc. 37; Garcia's Second Motion)

(collectively "Garcia Motions"), filed on April 2, 2015[2]; and (3) Defendant's Motion for

Summary Judgment and Suppor[t]ing Memorandum of Law (Doc. 48; United States'

---

[1] In support of her First Motion, Mrs. Garcia submits excerpts from the depositions of Dr. Steven Simons and Maj. Scott Schafer (Docs. 36-1, 36-2); Robert Garcia's death certificate (Doc. 36-3); and the expert reports of Dr. R. Whit Curry, Jr., (Doc. 36-4; Curry Report), and Dr. Shelley Hershner (Doc. 36-5; Hershner Report). Deposition page citations correspond to the page numbers assigned by the reporting service.

[2] In support of her Second Motion, Mrs. Garcia submits SGOMC Operating Instruction 44-2 (Doc. 37-1); a flow chart titled "Sleep Study Process" (Doc. 37-2); excerpts from the depositions of Dr. Steven Simons, Maj. Scott Schafer, Dr. Eric Ashman, Dr. Shelley Hershner, Dr. R. Whit Curry, Jr., Dr. Arthur Herold, and Dr. Stephen Kreitzer (Docs. 37-3–37-7, 37-9, 37-10); and Robert Garcia's death certificate (Doc. 37-8). At the Court's direction, see Doc. 62, Mrs. Garcia filed the full deposition of Dr. Curry and its accompanying exhibits (Doc. 65; Curry Depo.).

Motion), filed on June 1, 2015.[3] On April 27, 2015, the United States filed Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment as to Defendant's Twelfth Affirmative Defense (Doc. 45; United States' Response to Garcia's First Motion) and Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment as to the Standard of Care Relating to Delivery of Robert Garcia's Sleep Study to His Primary Care Manager (Doc. 46; United States' Response to Garcia's Second Motion).[4] On June 30, 2015, Plaintiff, Monica Garcia, filed Plaintiff's Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 52; Garcia's Response).[5] With the Court's leave, see Docs. 55, 60, the United States filed its Reply in Support of USA's Motion for Summary Judgment (Doc. 56; United States' Reply) on August 3, 2015,[6] and Mrs. Garcia filed Plaintiff's Sur-Reply to Defendant's Reply in Support of Its Motion for Summary Judgment (Doc. 61; Garcia's Surreply) on September 21, 2015. Accordingly, this matter is ripe for review.

---

[3] In support of its Motion, the United States submits the depositions of Maj. Scott Schafer (Docs. 48-1, 48-2; Schafer Depo.), Dr. Eric Ashman (Doc. 48-3; Ashman Depo.), Dr. Steven Simons (Doc. 48-4; Simons Depo.), Dr. Stephen Kreitzer (Doc. 48-5; Kreitzer Depo.), Dr. Arthur Herold (Doc. 48-6; Herold Depo.), and Nancy Johnston (Doc. 48-7; Johnston Depo.).

[4] In support of its response to Mrs. Garcia's First Motion, the United States submits excerpts from the depositions of Dr. Eric Ashman, Dr. Stephen Kreitzer, and Dr. Steven Simons (Docs. 45-1–45-3). In support of its response to Mrs. Garcia's Second Motion, the United States submits excerpts from the depositions of Maj. Scott Schafer and Dr. R. Whit Curry, Jr. (Docs. 46-1, 46-2).

[5] In support of her Response to the United States' Motion, Mrs. Garcia submits SGOMC Operating Instruction 44-2 (Doc. 52-1); a flow chart titled "Sleep Study Process" (Doc. 52-2); Dr. Shelley Hershner's deposition (Doc. 52-3; Hershner Depo.); Robert Garcia's death certificate (Doc. 52-4); expert reports of Dr. Arthur Herold (Doc. 52-5; Herold Reports), Dr. Stephen Kreitzer (Doc. 52-6; Kreitzer Report), and Dr. Steven Simons (Doc. 52-7; Simons Reports); and Col. Bradley Rust's deposition (Doc. 52-8; Rust Depo.).

[6] In support of its Reply, the United States submits Plaintiff's Answers to Defendant's Second Set of Interrogatories (Doc. 56-1).

## I.     Background[7]

On June 11, 2010, Robert Garcia attended an appointment with Captain (now Major) Scott Schafer, a certified physician's assistant, at the 673rd Medical Group at Joint Base Elmendorf-Richardson outside Anchorage, Alaska. Doc. 48-2 at 31–35. Maj. Schafer observed that Mr. Garcia "said he is … concerned with his sleep. He stated his wife's been telling him that he snores heavily[,] and he also mentioned not getting a full night of sleep lately." Id. at 32. Maj. Schafer further observed that Mr. Garcia had "no formal [history] of insomnia or sleep apnea; does not have [diagnosed] primary snoring." Id. at 34. Maj. Schafer noted that Mr. Garcia complained of ongoing sleep problems, increasing daytime somnolence, morning fatigue, and snoring problems, and that Mr. Garcia stated he had never had therapy for the problem but had been taking over-the-counter Tylenol PM daily. Id. Mr. Garcia denied having trouble falling asleep at night and denied falling asleep at work, in the car, and watching movies or television but reported waking up throughout the night. Id. Mr. Garcia reported he occasionally drank alcohol one to two hours before bed. Id. Additionally, Mr. Garcia denied any history of sleep apnea or restless-leg syndrome. Id. That same day, Maj. Schafer referred Mr. Garcia on a routine basis to the 673rd Medical Group's Sleep Disorder Center ("the Sleep Lab") for a sleep study. Id. In the meantime, Mr. Garcia attended several other appointments at Maj.

---

[7] Unless otherwise noted, the facts recited herein are undisputed based on the information provided by the parties.  Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment.  The Court will so note its perspective when appropriate.  The facts recited in this section are either undisputed, or any disagreement has been indicated.  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp.2d 1337, 1340 (M.D. Fla. 2008).

Schafer's request and saw Maj. Schafer on August 16, 2010, for a follow-up appointment. Id. at 10–30.

On August 16, 2010, Mr. Garcia participated in a split-night sleep study[8] conducted by Registered Polysomnographic Technologist Nancy Johnston. Johnston Depo. at 9; Ashman Depo. at 79, 118; Doc. 48-2 at 4–5. The study results were sent out for review by independent contractor Dr. Daron Scherr, a physician specializing in sleep medicine. Johnston Depo. at 36–37; Ashman Depo. at 50, 93.[9] Dr. Scherr issued a report, which included a diagnosis of "Severe Obstructive Sleep Apnea (OSA) with significant oxyhemoglobin desaturation"[10] and a recommendation that Mr. Garcia begin treatment with a continuous-positive-airway-pressure ("CPAP") machine.[11] Doc. 48-2 at 6–9. On August 25, 2010, Dr. Scherr's report was uploaded to the Department of Defense's electronic medical-record system, id. at 8, but was never sent to Maj. Schafer or Mr. Garcia, Schafer Depo. at 63–64; Herold Depo. at 85.

On October 5, 2010, Mr. Garcia saw Dr. Eric Ashman, a neurologist and the director of the Sleep Lab at the time, for a follow-up appointment to discuss the sleep-

---

[8] A split-night sleep study is a sleep study in which, during a single night, a patient who meets certain criteria undergoes diagnostic evaluation during the first half of the study and then receives positive-airway-pressure treatment during the second half. Johnston Depo. at 44–45; Ashman Depo. at 49–50.

[9] Although the United States cites no record evidence establishing that Dr. Scherr was an independent contractor rather than an employee, it listed that fact as undisputed in its Motion, see United States' Motion at 3 & n.2, and Mrs. Garcia neither challenged it in her Response or her First Motion nor pointed to any evidence suggesting that Dr. Scherr was in fact an employee of the United States. See generally Garcia's First Motion; Garcia's Response. Moreover, Dr. Ashman testified that Dr. Scherr was a contractor, Ashman Depo. at 50, and the nature of Dr. Scherr's relationship with the Sleep Lab supports that he was a contractor rather than an employee, see id. (describing Dr. Scherr as an "off-site" sleep specialist the Sleep Lab used because it did not have a specialist "on staff" at the time).

[10] Obstructive sleep apnea is the blockage of the upper airway interrupting airflow for at least 10 seconds despite respiratory effort. Schafer Depo. at 29; Johnston Depo. at 45–46. Oxyhemoglobin desaturation refers to a decrease in oxygen levels in the blood. Schafer Depo. at 30.

[11] A CPAP machine provides air pressure through a mask to open a patient's airway while he sleeps to allow him to breathe more evenly. Schafer Depo. at 31; Johnston Depo. at 45.

study results. Ashman Depo. at 74–75, 100; Doc. 48-2 at 1–3. Dr. Ashman discussed the results and treatment options with Mr. Garcia, and Mr. Garcia chose to begin treatment with a CPAP machine. Ashman Depo. at 100; Doc. 48-2 at 3. Dr. Ashman ordered the CPAP machine, Doc. 48-2 at 3, and the medical-equipment provider approved the order on October 12, 2010, Herold Depo. at 56. On October 16, 2010, before he received the CPAP machine, Mr. Garcia died. Doc. 1 ¶ 20; Doc. 29 ¶ 20. Although a medical examiner did not perform an autopsy or toxicological testing to determine Mr. Garcia's cause of death, see Doc. 52-4; Kreitzer Depo. at 90, the death certificate listed respiratory failure and obstructive sleep apnea as his causes of death, Doc. 52-4.

On December 29, 2010, Mrs. Garcia, her daughters (Jessica and Erica Garcia), and the Estate of Mr. Garcia filed administrative claims with the Department of the Air Force, and the United States denied them initially on November 22, 2011, and on reconsideration on August 12, 2012.[12] Doc. 1 ¶ 9; Doc. 29 ¶ 9. Mrs. Garcia then filed this lawsuit on December 20, 2012, alleging that federal employees and the medical facilities at JBER negligently failed to timely evaluate and treat Mr. Garcia's obstructive sleep apnea. Doc. 1 (Complaint). On March 18, 2013, the United States answered the Complaint. Doc. 5 (Answer). With the Court's leave, and without opposition from Mrs. Garcia, the United States filed an Amended Answer on October 16, 2014. Doc. 29. On April 2, 2015, Mrs. Garcia filed her First and Second Motions for partial summary judgment, and on June 1, 2015, the United States filed its Motion for summary judgment.

---

[12] The United States actually admits that it denied the claims on reconsideration on August 15, 2012, not August 12, as the Complaint alleges. See Doc. 29 ¶ 9. That discrepancy does not appear to be material. See 28 U.S.C. § 2401(b) (stating that an action raising a tort claim against United States must be brought "within six months after the date of mailing … of notice of final denial of the claim by the agency to which it was presented"); see generally Doc. 1 (Complaint filed on December 20, 2012).

## II.     Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[13] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to

---

[13] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## III.   Discussion[14]

It is well-established that the United States is immune from suit unless it has consented to be sued, and its consent to be sued defines the terms and conditions upon which it may be sued. United States v. Mitchell, 445 U.S. 535, 538 (1980). The Federal Tort Claims Act ("FTCA") provides that the United States may be held liable for money

---

[14] Because the United States' Motion seeks summary judgment as to all claims raised in the Complaint, it subsumes the specific issues Mrs. Garcia raises in the Garcia Motions. The Court therefore addresses the parties' arguments, including those raised in the Garcia Motions, as the parties frame them in the context of the United States' Motion.

damages for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" in the same manner and to the same extent as a private person under like circumstances. 28 U.S.C. § 1346(b)(1); Turner ex rel. Turner v. United States, 514 F.3d 1194, 1203 (11th Cir. 2008). Thus, the "FTCA is a specific, congressional exception" to the United States' sovereign immunity.  Suarez v. United States, 22 F.3d 1064, 1065 (11th Cir. 1994). As such, the waiver of sovereign immunity permitted under the FTCA "must be scrupulously observed, and not expanded, by the courts." Id. While the FTCA waives the United States' sovereign immunity from suit in federal courts for the negligent actions of its employees, this waiver of sovereign immunity is subject to several exceptions, Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998), including for performance of or failure to perform a discretionary function, 28 U.S.C. § 2680(a), and for acts or omissions of an independent contractor, see 28 U.S.C. § 2671; Means v. United States, 176 F.3d 1376, 1379–80 (11th Cir. 1999).

Pursuant to the FTCA, the liability of the United States is determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), which, in this case, is the state of Alaska. Under Alaska law, a plaintiff bringing an action based on medical malpractice must prove the following by a preponderance of the evidence:

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

(2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

AS § 09.55.540(a). There is no presumption of negligence. AS § 09.55.540(b).

"In medical malpractice actions[,] the jury ordinarily may find a breach of professional duty only on the basis of expert testimony … [except] in non-technical situations where negligence is evident to lay people." Kendall v. State, Div. of Corrs., 692 P.2d 953, 955 (Alaska 1984). Alaska Statutes section 09.20.185 governs expert-witness qualifications in medical-malpractice actions.[15] Under that provision, an expert is competent to testify on the issue of the appropriate standard of care if he or she is:

(1) a professional who is licensed in [Alaska] or in another state or country;

(2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and

(3) certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue.

AS § 09.20.185(a).

**A.     United States' Objections to Experts**

Citing Liebsack v. United States, 731 F.3d 850 (9th Cir. 2013), the United States contends that Mrs. Garcia has failed to proffer experts competent to testify as to the standards of care applicable to Dr. Ashman and Johnston. United States' Motion at 9, 11–12. It argues that Alaska Statutes section 09.20.185(a) must be construed narrowly

---

[15] The United States contends, and Mrs. Garcia does not challenge, that section 09.20.185 applies to an FTCA action based on medical negligence. See United States' Motion at 7–8; see generally Garcia's Response. The United States Court of Appeals for the Ninth Circuit has expressly held as much, see Liebsack v. United States, 731 F.3d 850, 857 (9th Cir. 2013), and its reasoning comports with McDowell v. Brown, 392 F.3d 1283, 1295–96 (11th Cir. 2004), in which the United States Court of Appeals for the Eleventh Circuit held that a state law governing expert-witness competency in the context of a medical-malpractice action requiring expert testimony is substantive.

such that Mrs. Garcia would need expert opinions from a neurologist to opine on the standard of care applicable to Dr. Ashman and from a registered polysomnographic technologist to opine on the standard of care applicable to Johnston. Id. at 8–9, 11–12. Mrs. Garcia responds that the statute requires an expert who specializes in a field or matter that is at issue in the case and that she bears the burden of establishing violation of a standard of care ordinarily exercised by providers "in the field or specialty in which the defendant is practicing." Garcia's Response at 8–10. As such, she argues, Dr. Kreitzer—a specialist in sleep medicine with expertise in sleep-clinic operation—is competent to testify because the field at issue in this case is sleep medicine, and Dr. Ashman was practicing in sleep medicine (not neurology) when he was the director of the Sleep Lab. Id. She does not respond to the United States' contention that no expert is competent to testify as to the standard of care applicable to Johnston. See generally Garcia's Response; Garcia's Surreply.

The Court does not address whether Dr. Kreitzer is competent to testify as an expert in this case. As explained infra, his opinions do not create a genuine dispute for trial because they do not establish that any specific federal employee was negligent in a way that proximately caused Mr. Garcia's death. Thus, whether he is a competent expert witness under Alaska law is immaterial. Similarly, whether any of Mrs. Garcia's experts is competent to opine as to the standard of care applicable to Johnston is immaterial because, as discussed infra, no expert opined that Johnston violated any standard of care.

### B.    Mrs. Garcia's Claims

The parties agree that, to succeed on her claims under the FTCA, Mrs. Garcia must identify specific government employees who she contends were negligent. See United States' Motion at 17; Garcia's Response at 5–11; Garcia's Surreply at 3–4. Indeed, "[t]he alleged tortfeasor's status as an 'employee of the government' is the sine qua non of liability under the FTCA." Means, 176 F.3d at 1379 (quoting 28 U.S.C. § 1346(b)(1); citing Sheridan v. United States, 487 U.S. 392, 400–01 (1988)). As such, a claim can proceed against the United States under the FTCA only to the extent the person purportedly responsible for the alleged harm was a government employee. "The FTCA defines an 'employee of the government' to include 'officers or employees of any federal agency, members of the military or naval forces of the United States, … and any persons acting on behalf of a federal agency in any official capacity." Id. (quoting 28 U.S.C. § 2671). "Whether an individual is an employee of the United States for purposes of the FTCA is determined by federal law." Id. As such, the Court will focus on the people who Mrs. Garcia contends were negligent: Maj. Schafer, Dr. Rebecca Briscoe, the "sleep lab personnel" (Johnston, Sayuri Jackson,[16] Sgt. Dyson, and Sgt. Hess[17]), and Dr. Ashman. See Garcia's Response at 5–11. The United States contends that Mrs. Garcia has presented no evidence establishing that any of those people was negligent, see United States' Motion at 9–14, 17; United States' Reply at 1–7; in response, Mrs. Garcia contends that her experts' opinions establish that some or all of those people violated

---

[16] According to Johnston, Sayuri Jackson worked on the day shift at the Sleep Lab. Johnston Depo. at 24–25.

[17] Neither party provides the first names of Sgts. Dyson or Hess. In describing them as the officers who were in charge of the Sleep Lab's day-to-day operations during the relevant time frame, Mrs. Garcia cites the deposition of Dr. Ashman, who also does not identify their first names. See Garcia's Response at 7; Ashman Depo. at 40.

applicable standards of care, which contributed to the delay in Mr. Garcia's treatment that purportedly led to his death, see Garcia's Response at 5–11; Garcia's Surreply at 3–4.

### 1. Maj. Schafer

Mrs. Garcia contends that Maj. Schafer "was negligent in three primary ways": (1) failing to follow up after referring Mr. Garcia for a sleep study to ensure that he was timely scheduled for one; (2) failing to ensure that he obtained a copy of Dr. Scherr's report; and (3) failing to ensure that Mr. Garcia received a copy of the report. Garcia's Response at 6–7. The United States argues that Maj. Schafer appropriately ordered the sleep study, and there is no evidence that he could have affected its scheduling; Mrs. Garcia's own expert stated that the failure to send the report to Maj. Schafer was not Maj. Schafer's fault; there is no evidence that Maj. Schafer would or should have ordered the CPAP machine himself or could have obtained an earlier appointment with a physician had he scheduled an appointment with Mr. Garcia before Dr. Ashman saw Mr. Garcia; and no expert opined that the failure to provide Mr. Garcia with Dr. Scherr's report was Maj. Schafer's fault. United States' Motion at 12–14; United States' Reply at 1–4.

As to Mrs. Garcia's first contention, Dr. Herold opined that Maj. Schafer "should have proceeded with more urgency to evaluate Mr. Garcia for obstructive sleep apnea." Herold Depo. at 38, 64–65; Herold Report at 5. Although he did not elaborate on what Maj. Schafer should have done to ensure a more timely sleep study, his earlier testimony suggests that he believed Maj. Schafer should have called the Sleep Lab to try to expedite the evaluation. See Herold Depo. at 19–20 (stating that Dr. Herold would call specialists to try to expedite evaluation of more urgent matters). Dr. Curry opined that Maj. Schafer did not deviate from the usual standard of care because he ordered the sleep study and

had no control over its scheduling. Curry Depo. at 41; Curry Report at 2. As such, whether Maj. Schafer violated a standard of care in failing to follow up on his referral is arguably in dispute. However, this dispute is not a material dispute for trial.

The record evidence shows that Maj. Schafer ordered the sleep study on June 11, 2010, the same day Mr. Garcia first complained of sleep problems, see Schafer Depo. at 37, and Mrs. Garcia does not argue that he should have done so more quickly. Notably, Dr. Herold acknowledged that Maj. Schafer did not need to request the sleep study on an "urgent" or "stat" basis. See Herold Depo. at 42–43. Mrs. Garcia points to no evidence suggesting that Maj. Schafer had any control over scheduling the sleep study or supporting an inference that an earlier appointment would have been available. It would be unreasonable to infer, without any supporting evidence, that Maj. Schafer could have expedited Mr. Garcia's study by following up with the Sleep Lab, particularly in light of evidence that (1) the Sleep Lab was created to address "the low local capability" for performing sleep studies, see Rust Depo. at 17, and (2) the Sleep Lab itself had a documented significant wait list at the time delaying appointments, see Ashman Depo. at 107–12 (discussing clinic's wait list as of September 2010, which had 70 patients and resulted in appointments scheduled at least 45 days out). Any finding that Maj. Schafer's alleged negligence contributed to the delay in evaluation purportedly leading to Mr. Garcia's death would require unfounded speculation that a phone call from Maj. Schafer more likely than not would have led to Mr. Garcia receiving an earlier appointment for a sleep study.[18] Mrs. Garcia has pointed to no evidence to support such an inference. As

---

[18] None of Mrs. Garcia's experts provided a clear opinion as to the extent of the efforts required by the standard of care to obtain a more timely sleep study, although their testimony suggests it might have been appropriate or even necessary to refer Mr. Garcia to one of the sleep clinics in Anchorage if an earlier appointment at the Sleep Lab was unavailable. See Simons Depo. at 48–49; Kreitzer Depo. at 74.

such, Mrs. Garcia has not made a sufficient showing to establish that Maj. Schafer's alleged negligence in failing to follow up on his referral proximately caused Mr. Garcia's death.

As to Mrs. Garcia's second contention, Dr. Herold opined that Maj. Schafer should have directed Mr. Garcia to return for a follow-up appointment after the sleep study as a fail-safe to ensure that he received the report and Mr. Garcia timely received appropriate care and that his failure to do so was a violation of the standard of care, Herold Depo. at 16, 59–61. Dr. Curry opined that the failure to provide Maj. Schafer with the report did not present a standard-of-care issue as to Maj. Schafer. Curry Depo. at 39–40. As such, whether Maj. Schafer violated a standard of care in failing to schedule a follow-up after the sleep study to ensure he received the report is arguably in dispute. Mrs. Garcia contends that, had Maj. Schafer scheduled the follow-up appointment, he could have ordered the CPAP machine on his own, rather than wait for one of the Sleep-Lab physicians to do so. Garcia's Response at 6–7. Although Maj. Schafer testified that he could have done so, see Schafer Depo. at 72, 74, Mrs. Garcia points to no more than "a mere scintilla" of evidence suggesting that Maj. Schafer would have or should have done so. Indeed, Maj. Schafer testified that he had only ordered a CPAP machine two or three times in his career, and only after the patients had already met with a specialist and agreed with the specialist on that treatment but encountered difficulties in actually

---

Nevertheless, Mrs. Garcia points to no evidence that could support an inference that an outside referral would have been possible, and, as discussed, Col. Rust's deposition suggests that the other clinics also had problems with availability. Drs. Simons and Kreitzer acknowledged that they did not know whether it would have been possible to schedule an earlier appointment for a sleep study, Simons Depo. at 48–49; Kreitzer Depo. at 74–75, and Dr. Simons opined that Mr. Garcia's case did not warrant flying him out of the area for a sleep study if no earlier appointment in the Anchorage area was available, Simons Depo. at 49–50.

obtaining the equipment; he otherwise had only ever ordered replacement parts for patients already established on CPAP treatment; and, in light of the severity of Mr. Garcia's obstructive sleep apnea, he might have written a prescription for the machine if necessary after Mr. Garcia had followed up with a specialist.[19] Id. Moreover, Dr. Hershner opined that she did not believe that Maj. Schafer had the background to order CPAP equipment. Hershner Depo. at 39. Thus, any inference that he would have ordered the CPAP machine on his own without Mr. Garcia first having followed up with a specialist would be unreasonable. Moreover, Mrs. Garcia does not point to any expert opinion that Maj. Schafer would have violated a standard of care if he had been able to order the CPAP machine but declined to do so in favor of deferring to the specialist. Indeed, in response to a question asking whether it would be appropriate for a physician's assistant "to want the specialty provider to be the one that has the follow-up after the sleep study," Dr. Herold opined that it is "the typical expectation" that a referring provider would want the referral specialist "to bring the whole thing to completion…. Not just say, [']well, I'll start the evaluation, but you got to go to your primary doctor to figure all this out.[']"[20]

---

[19] Specifically, Maj. Schafer testified as follows:

> I would have reviewed [Dr. Scherr's report] and asked the patient [if] he's followed up with a specialist yet and if he has I would make sure that whatever choice he chose for treatment[,] that it was being incorporated. So if he needed a script for his CPAP machine I would have provided it based on the recommendations from the sleep specialist.

Schafer Depo. at 72 (emphasis added). Later, in response to counsel's question asking whether Maj. Schafer "would want to get the CPAP that has been recommended by Dr. [Scherr] as soon as possible," Maj. Schafer responded, "Yes, if that patient chose that treatment." Id. at 76. But that testimony is insufficient to establish that Maj. Schafer would have independently ordered the CPAP machine without Mr. Garcia first having seen a specialist in light of his earlier testimony.

[20] Dr. Herold also opined that if Maj. Schafer had scheduled a follow-up appointment and discovered that he had not received Dr. Scherr's report, he could have obtained the report and "assist[ed] on getting the equipment authorized." Herold Depo. at 59. However, he did not opine in his deposition that it would have been necessary or even appropriate for Maj. Schafer to take it upon himself to prescribe the CPAP machine without Mr. Garcia first having seen a specialist in person.

Herold Depo. at 62. Mrs. Garcia also points to no evidence suggesting that Maj. Schafer could have gotten Mr. Garcia an earlier appointment with Dr. Ashman or another physician at the Sleep Lab or elsewhere had he seen Mr. Garcia for a follow-up appointment; again, Mrs. Garcia identifies no evidence supporting an inference that Maj. Schafer could have shortened the delay, and such an inference would be unreasonable in light of the documented wait list at the Sleep Lab. See Ashman Depo. at 107–12. As such, Mrs. Garcia has not made a sufficient showing to establish that Maj. Schafer's alleged negligence in failing to schedule a follow-up appointment and ensure he received Dr. Scherr's report proximately caused Mr. Garcia's death.

As to Mrs. Garcia's third contention, although Dr. Herold opined that the failure to provide Mr. Garcia with Dr. Scherr's report was a violation of the standard of care, he did not opine that that failure was attributable to Maj. Schafer. See Herold Depo. at 85. Moreover, Mrs. Garcia points to no evidence suggesting or supporting an inference that Mr. Garcia could have or would have obtained timely care had he received Dr. Scherr's report. As such, Mrs. Garcia has not made a sufficient showing to establish that Maj. Schafer violated a standard of care in failing to ensure that Mr. Garcia received Dr. Scherr's report or that any alleged violation proximately caused Mr. Garcia's death.

In short, although there are genuine disputes as to whether Maj. Schafer violated an applicable standard of care as well as whether delays in Mr. Garcia's evaluation and treatment caused his death, Mrs. Garcia fails to connect the two, as she points to no evidence suggesting that Maj. Schafer's alleged negligence caused any delay in Mr. Garcia's evaluation or treatment.

### 2. Dr. Briscoe

Citing Dr. Herold's deposition, Mrs. Garcia contends that Dr. Briscoe, Maj. Schafer's supervising physician during the relevant time frame, breached the standard of care applicable to a physician supervising a physician's assistant by failing to ensure that Maj. Schafer timely obtained a sleep study for Mr. Garcia. Garcia's Response at 7. The United States responds that Mrs. Garcia had not previously identified Dr. Briscoe as a potentially negligent employee or even as a person with knowledge of the case; there is insufficient evidence to establish that Dr. Briscoe was in fact Maj. Schafer's supervising physician; and Dr. Herold's opinion fails to account for the manner in which Dr. Briscoe actually supervised Maj. Schafer. United States' Reply at 4–5.

Assuming Dr. Briscoe was Maj. Schafer's supervising physician,[21] Mrs. Garcia has identified no evidence suggesting that Dr. Briscoe was actually negligent. Dr. Herold opined that Maj. Schafer's supervising physician should have recognized the unacceptable delay in obtaining a sleep study for Mr. Garcia and advised Maj. Schafer to follow up. Herold Depo. at 72–74. But his opinion is based on an assumption that Dr. Briscoe reviewed all of Maj. Schafer's charts—or, at the very least, that she reviewed Mr. Garcia's chart specifically. Mrs. Garcia points to no evidence supporting that assumption, and, indeed, Maj. Schafer testified that Dr. Briscoe did not review or sign off on all of his charts. Schafer Depo. at 18. Instead, he testified, she would conduct yearly performance reviews and serve as a general resource for any questions he had. Id. at 18–19. He

---

[21] Maj. Schafer initially testified that Dr. Briscoe was his supervising physician during the relevant time frame, Schafer Depo. at 17–18, but later wavered, testifying that he was unsure whether she or another physician (Dr. Hunsinger) was his supervisor at the time, id. at 22–23. Whether it was Dr. Briscoe or some other physician is irrelevant because, as discussed infra, Mrs. Garcia points to no evidence suggesting that anyone reviewed—or should have reviewed—Mr. Garcia's chart.

testified that 10 to 20 charts would be subject to peer review every month but that his supervising physician was not necessarily the person who reviewed his charts. Id. at 19. He further testified that he did not know whether anyone had reviewed Mr. Garcia's chart during the relevant time frame. Id. at 21–22. Mrs. Garcia points to no evidence supporting a conclusion that the standard of care requires a supervising physician to review every chart of a patient seen by a physician's assistant. Because Mrs. Garcia has presented no evidence that Dr. Briscoe either should have reviewed or did review Mr. Garcia's chart, she cannot establish that Dr. Briscoe violated any standard of care.

### 3. The Sleep-Lab Personnel

Mrs. Garcia "submits that at least one, if not all, of these individuals [(Johnston, Jackson, Dyson, and Hess)] had the responsibility to forward Dr. Scherr's report to" Maj. Schafer and remind him by e-mail that the report was available for his review. Garcia's Response at 7–8. The United States responds that Mrs. Garcia had previously argued that the Sleep-Lab personnel were not key witnesses; did not identify Ms. Jackson or Sgts. Dyson or Hess in her initial disclosures, discovery responses, or expert reports; has not disclosed an expert competent to opine on the standards of care owed by any of the identified personnel; and has not shown that any of them actually failed to perform any assigned duty. United States' Reply at 5–6.

The evidence establishes that the failure to forward Dr. Scherr's report to Maj. Schafer and inform him that the report was available violated a standard of care. See Herold Depo. at 82–84 (finding violation of standard of care); Kreitzer Depo. at 108–09 (same); Hershner Depo. at 30–37 (same).[22] However, Mrs. Garcia points to no evidence

---

[22] In her Second Motion, Mrs. Garcia seeks partial summary judgment on the issue of whether the failure to forward Dr. Scherr's report to Maj. Schafer violated the standard of care. See Garcia's Second

suggesting who among Mss. Johnston and Jackson and Sgts. Dyson and Hess, if any of them, actually had the responsibility to ensure delivery of Dr. Scherr's report to Maj. Schafer and inform him of its availability. Instead, she relies on an assumption that one of them must have had that responsibility. See generally Garcia's Second Motion; see also Garcia's Response at 7–8. But "a party's mere belief and/or speculation is not based on personal knowledge and is not competent summary judgment evidence." Riley v. Univ. of Ala. Health Servs. Found., P.C., 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (internal quotation marks omitted); see also Foster v. Biolife Plasma Servs., LP, 566 F. App'x 808, 811 (11th Cir. 2014) (citing Rule 56(c)(4), stating that speculative testimony not based on personal knowledge is insufficient to oppose a motion for summary judgment). Although, as Mrs. Garcia's experts opined, someone breached a standard of care in failing to forward the report to Maj. Schafer and notify him that it was available for review, Mrs. Garcia fails to cite any evidence establishing who that person was or whether he or she

---

Motion. She contends that all of the experts testified that the failure to send the report to Maj. Schafer amounted to a violation of the standard of care. Id. at 2–3, 5–8. The United States responds that the internal facility standards Mrs. Garcia cites cannot by themselves establish a standard of care; that Dr. Curry's testimony creates a genuine dispute as to whether the failure to forward the report violated the standard of care; and that Mrs. Garcia has not identified a federal employee responsible for any violation. United States' Response to Garcia's Second Motion at 6–11.

Mrs. Garcia points to expert testimony—not solely the internal standards—to establish the standard of care. See Garcia's Second Motion at 6–8. Expert testimony is sufficient to establish a standard of care under Alaska law. See Kendall, 692 P.2d at 955. As such, assuming the experts Mrs. Garcia cites are competent to testify as to the standard of care in this context, their testimony is sufficient to establish the existence and violation of the standard of care. Moreover, Dr. Curry clarified that he opined only that the failure to forward the report is "not a standard-of-care issue as far as Major Schafer goes," Curry Depo. at 39–40, and that "from [his] perspective" forwarding the report is an expectation, id. at 31–32. He did not opine that the failure to forward the report was not a violation of any standard of care applicable to any person; indeed, the United States offered him as an expert witness on the standard of care with respect to Maj. Schafer only. See id. at 42, 55. Because there is no expert testimony countering the opinions finding a violation of the standard of care in the failure to forward Dr. Scherr's report to Maj. Schafer, there is no genuine dispute as to that fact, and summary judgment in Mrs. Garcia's favor as to that narrow issue would be warranted. Nevertheless, for the reasons discussed infra, whether such a violation occurred is not material because Mrs. Garcia has failed to point to any evidence (1) establishing who was responsible for the violation or whether that person was a federal employee or (2) suggesting that any such violation proximately caused the delay in Mr. Garcia's treatment.

was a government employee.[23] As such, she cannot establish that any of the identified Sleep-Lab personnel were negligent.[24] Moreover, as discussed <u>supra</u> at 14–16, Mrs. Garcia also fails to point to any evidence suggesting that the failure to provide the report to Maj. Schafer or notify him proximately caused Mr. Garcia's death.

### 4. Dr. Ashman

In an effort to avoid the consequences of her inability to identify a specific employee responsible for forwarding Dr. Scherr's report to Maj. Schafer, Mrs. Garcia seeks to impute to Dr. Ashman the negligence of the unidentified individual(s) responsible for forwarding Dr. Scherr's report, arguing that Dr. Ashman had the final responsibility to ensure that patients of the Sleep Lab received timely care. Garcia's Response at 8. The United States argues that Mrs. Garcia failed to provide a competent expert to opine on the standard of care applicable to Dr. Ashman, that no expert opined that Dr. Ashman breached a standard of care, and that, in any event, Mrs. Garcia's argument essentially amounts to a contention that Dr. Ashman negligently supervised his staff and so is barred by the discretionary-function exception. United States' Motion at 9–11; United States' Reply at 6–7.

The United States is accurate that no expert opined that Dr. Ashman breached any standard of care. Dr. Herold testified that he was not providing any opinion as to whether

---

[23] Mrs. Garcia does make a blanket statement that "all" of the individuals she identifies in her Response were employees of the United States during the relevant time frame. <u>See</u> Garcia's Response at 2. But she points to no evidence supporting that statement.

[24] Dr. Herold also opined that the failure to provide Dr. Ashman with Dr. Scherr's report was a violation of the standard of care. Herold Depo. at 86. Mrs. Garcia does not reference that alleged violation in her Response, <u>see generally</u> Garcia's Response, but she does mention it in her Surreply, <u>see</u> Garcia's Surreply at 4. That contention suffers from the same deficiency as the Sleep-Lab personnel's other alleged violations: Mrs. Garcia points to no evidence suggesting who actually had the responsibility to forward the report or that that person was a federal employee.

Dr. Ashman violated a standard of care. Herold Depo. at 48–53. As to Dr. Kreitzer, in response to a question asking whether he was "offering an opinion that Dr. Ashman breached the standard of care in some way," Dr. Kreitzer testified, "I do not feel he breached. I think he did everything appropriately." Kreitzer Depo. at 106.[25] And as for Dr. Simons, in response to a question asking whether he was opining that there was "a system failure here as opposed to a particular provider such as Major Schafer or Dr. Ashman violating a standard of care," Dr. Simons responded, "Correct," with the caveat that he did not know whether someone in particular was responsible for any of the identified system failures. Simons Depo. at 64–65. Although Mrs. Garcia's experts opined that the failure to forward Dr. Scherr's report to Maj. Schafer and the delay in providing Mr. Garcia with a follow-up appointment at the Sleep Lab violated the standard of care, none of them attributed those shortcomings to inadequate supervision of the Sleep Lab. Without an expert opinion supporting her claim, she cannot establish that Dr. Ashman was negligent.[26] See Kendall, 692 P.2d at 955.

---

[25] Mrs. Garcia contends that Dr. Kreitzer opined only that Dr. Ashman's medical treatment did not violate any standard of care. Garcia's Response at 10. But the context of the testimony does not support that characterization. Counsel for the United States asked whether Dr. Kreitzer was offering an opinion that Dr. Ashman violated a standard of care "in some way," and Dr. Kreitzer responded that he thought Dr. Ashman "did everything appropriately." Kreitzer Depo. at 106. Nothing about his testimony suggests he confined his opinions only to Dr. Ashman's treatment role and not his supervisory role with the Sleep Lab. In any event, Dr. Kreitzer did not provide any opinion that Dr. Ashman violated any standard of care in supervising the Sleep Lab, so his testimony does not support Mrs. Garcia's contention that Dr. Ashman violated a standard of care in that capacity.

[26] As noted, the United States also contends that Mrs. Garcia's claim that Dr. Ashman negligently supervised the Sleep Lab is barred by the FTCA's discretionary-function exception. "The discretionary function exception . . . precludes government liability for '[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" Cohen, 151 F.3d at 1340 (quoting 28 U.S.C. § 2680(a)). The Supreme Court has enunciated a two-part test for determining whether the discretionary function exception bars suit against the United States. United States v. Gaubert, 499 U.S. 315, 322-23 (1991) (citing Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)); see also Ochran v. United States, 117 F.3d 495, 499 (11th Cir. 1997). "First, the court must examine whether the challenged conduct is 'discretionary in nature' or whether the conduct 'involve[s] an element of judgment or choice.'" U.S. Aviation Underwriters, Inc. v. United States, 562 F.3d 1297, 1299 (11th Cir.

### 5. Dr. Scherr

Neither party contends that Dr. Scherr was negligent in any way. See Garcia's First Motion at 3, 5, 7–8; United States' Response to Garcia's First Motion at 11–13; United States' Motion at 16; Garcia's Response at 3 n.4. Nevertheless, apparently in an abundance of caution, the United States contends that a genuine dispute exists as to whether Dr. Scherr was negligent. See United States' Response to Garcia's First Motion at 11–13; see also United States' Motion at 16. Regardless, the United States argues, and Mrs. Garcia does not dispute, that Dr. Scherr was an independent contractor, not an employee of the United States. United States' Motion at 3 & n.2; see generally Garcia's First Motion; Garcia's Response; Garcia's Surreply. As such, the United States cannot be liable for Dr. Scherr's negligence. See Means, 176 F.3d at 1379–80 (plaintiff may not recover against United States for torts of independent contractor). Mrs. Garcia argues in her First Motion that Alaska Statutes section 09.17.080(a)(2) precludes the United States from allocating fault to Dr. Scherr because the United States did not join him as a party to the case despite having had an opportunity to do so. Garcia's First Motion at 6–7. Although the FTCA requires application of state law to determine liability, it does not waive the United States' sovereign immunity at all to the extent the alleged harm was caused by an independent contractor of the government. See Means, 176 F.3d at 1380–81 (holding that, because individuals who allegedly committed tortious acts were not

---

2009) (quoting Gaubert, 499 U.S. at 322) (internal quotation omitted). "Second, the court must decide 'whether that judgment is of the kind that the discretionary function exception was designed to shield,' i.e., whether it is 'susceptible to policy analysis.'" Id. (quoting Gaubert, 499 U.S. at 322, 325)). Because the Court finds Mrs. Garcia has failed to point to any evidence establishing a genuine dispute as to whether Dr. Ashman was negligent, whether his supervisory actions are subject to the exception is immaterial.

government employees, court did not have jurisdiction over claims). Because the United States cannot be held liable for Dr. Scherr's acts or omissions, whether he was negligent is immaterial. As discussed, in order to prevail, it is incumbent upon Mrs. Garcia to identify specific employees of the United States whose negligence proximately caused Mr. Garcia's death, so she has the burden of producing evidence that someone other than Dr. Scherr was responsible for the delays in Mr. Garcia's evaluation and treatment. Moreover, because the United States would be immune from suit to the extent Mr. Garcia's death resulted from Dr. Scherr's negligence, the Alaska statutory provision requiring Dr. Scherr's joinder is simply inapplicable; that is, there is no basis for referring to Alaska law because the FTCA would not confer subject-matter jurisdiction in the first place. Cf. Camozzi v. Roland/Miller & Hope Consulting Grp., 866 F.2d 287, 289 n.7 (9th Cir. 1989) (holding that discretionary-function exception is not overridden by state tort rules because "[t]he extent of the immunity of the United States to suit is governed by section 2680(a), which cannot be preempted by state law"). Applying section 09.17.080(a)(2) to preclude the United States from avoiding liability for Dr. Scherr's negligence would effectively allow Alaska law to override the boundaries of the FTCA's limited waiver of the United States' sovereign immunity. Such an outcome is not supported by the law.

## IV.   Conclusion

In summary, Mrs. Garcia alleges that the delays in evaluating and treating Mr. Garcia's obstructive sleep apnea violated the standard of care and ultimately caused his death. She provides expert opinions to that effect. But she does not point to any evidence connecting those delays to negligent acts or omissions by any particular employee of the

United States. Without identifying any tortfeasor employed by the United States, Mrs. Garcia cannot state a claim against the United States under the FTCA. In light of the foregoing, the United States is entitled to summary judgment in its favor. Its Motion is therefore due to be granted in its entirety and the Garcia Motions are due to be denied as moot.[27] Accordingly, it is hereby

**ORDERED:**

1.   Defendant's Motion for Summary Judgment and Suppor[t]ing Memorandum of Law (Doc. 48) is **GRANTED**.

2.   Plaintiff's Motion for Partial Summary Judgment as to Defendant's Twelfth Affirmative Defense and Incorporated Memorandum of Law in Support of Same (Doc. 36) and Plaintiff's Motion for Partial Summary Judgment as to the Standard of Care Relating to Delivery of Robert Garcia's Sleep Study Report to His Primary Care Manager and Incorporated Memorandum of Law in Support of Same (Doc. 37) are **DENIED as MOOT**.

3.   The Clerk of the Court is directed to enter **JUDGMENT** in favor of the United States and against Mrs. Garcia.

---

[27] Mrs. Garcia contends that the United States failed to address Count II of her complaint in its Motion or Reply. Garcia's Surreply at 3. Count II alleges generally that the facility, as an entity, was negligent in failing to employ and/or follow procedures, policies, and practices and supervise its staff to ensure timely and appropriate care. Complaint ¶¶ 24–26. In her Surreply, however, Mrs. Garcia suggests that Count II is based on "a systemic failure on the part of [the United States] to provide timely treatment for Robert Garcia" and that that failure "was the direct result of the cumulative failure of specifically identified individuals." Garcia's Surreply at 4. She does not point to any evidence supporting her allegation that either the 673rd Medical Group generally or the Sleep Lab specifically failed to create adequate policies and procedures, and she addresses the alleged failure to follow existing policies and procedures in the context of the specific individuals she identifies in her Response. See Garcia's Surreply at 4. She therefore apparently intends to base her argument as to Count II on the same alleged negligence of specifically identified individuals on which she relies to support Count I. As such, it is unclear how Count II as she now defines it differs from Count I, and to the extent it does, she has not pointed to any evidence to support any additional theory of recovery under that count.

4.    The Clerk of the Court is further directed to terminate all remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 5th day of November, 2015.

MARCIA MORALES HOWARD
United States District Judge

lc21

Copies to counsel of record